**UNITED STATES of America,
Plaintiff—Appellee,**

v.

**Ivy Byrd GAINES, Defendant—
Appellant.**

No. 05–30333.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 17, 2006.*

Decided Sept. 5, 2006.

---

* This panel unanimously finds this case suitable for decision without oral argument. *See*  Fed. R.App. P. 34(a)(2).

Andrew C. Friedman, Esq., Tessa M. Gorman, Esq., USSE—Office of the U.S. Attorney, Seattle, WA, for Plaintiff–Appellee.

David B. Bukey, Esq., Bukey & Bentley, Seattle, WA, for Defendant–Appellant.

Before: REAVLEY,** PREGERSON, and CALLAHAN, Circuit Judges.

** The Honorable Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

## MEMORANDUM ***

A branch of the Key Bank in Auburn, Washington, which was patronized by defendant, Ivy Gaines, was the first and also the final target in a string of robberies of financial institutions in the area. Shortly after the second Key Bank robbery, Gaines was arrested driving the known get-away car and was subsequently identified by multiple witnesses. Search of Gaines's person, car, and home yielded substantial incriminating evidence, including a gun, identifiable stolen cash and checks, clothing and a loot bag unique to the robber, and stick-up notes in Gaines's handwriting. Gaines was convicted by a jury of ten counts of bank robbery and eight counts of use of a firearm during commission of a crime of violence; and was sentenced to 595–days' imprisonment for the former offenses plus 182–years' imprisonment for the latter. Gaines challenges both his conviction (attacking show-up and line-up witness identifications, *Miranda* waiver, and prosecutorial conduct) and his sentence (on Eighth Amendment grounds). For the following reasons, we affirm both Gaines's conviction and sentence.

## I. Gaines's Challenge to Line-up Identifications

■ Gaines first argues that, because of disparities in size and age between him and the "fillers" included in a pre-trial line-up, the line-up was impermissibly suggestive such that the district court erred by admitting into evidence identifications made by line-up witnesses and their subsequent in-court identifications. Whether a pre-trial identification procedure is impermissibly suggestive is reviewed *de novo*. *United States v. Johnson*, 820 F.2d 1065, 1072 (9th Cir.1987). If the procedure was impermissibly suggestive, the court determines whether or not the identification

procedure (whether concerning a pre-trial identification or subsequent in-court identification) is nonetheless sufficiently reliable to be admitted into evidence. *Id.* We review for abuse of discretion a district court's finding that an identification, including an in-court identification, is reliable. *United States v. Carbajal*, 956 F.2d 924, 929 (9th Cir.1992).

We have approved the introduction of line-up identifications "where the defendant looked fairly similar to others in the lineup." *Van Tran v. Lindsey*, 212 F.3d 1143, 1156 (9th Cir.2000); *see also United States v. Barrett*, 703 F.2d 1076, 1084–85 (9th Cir.1983); *United States v. Collins*, 559 F.2d 561, 563–64 (9th Cir.1977). We have rejected the requirement that the defendant look "nearly identical" to the other members. *Van Tran*, 212 F.3d at 1156.

In this case, color photographs reflect that the line-up consisted of Gaines and five other black males who look "fairly similar" to him. While Gaines does appear to be the most bulky, the disparities between the height and weight of Gaines and the height and weight of the fillers are much less apparent than the self-reported physical statistics suggest. Further, while the youngest line-up member was, in fact, nineteen years younger than Gaines, the others were either slightly older than Gaines (four to six years) or slightly to moderately younger than Gaines (four to sixteen years), with the photographs again reflecting no glaring age disparities. Examining the totality of the surrounding circumstances, we do not find the out-of-court line-up identification so impermissibly suggestive as to give rise to a substantial likelihood of mistaken identification and to taint subsequent identification testi-

---

*** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

mony. *United States v. Bagley*, 772 F.2d 482, 492–93 (9th Cir.1985).

■ Even if the line-up identification was unduly suggestive, its admission was proper if it was nonetheless reliable under the totality of the circumstances. *United States v. Nash*, 946 F.2d 679, 681 (9th Cir.1991). In considering whether the identification was reliable, we consider the factors set forth by the Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).[1] The line-up witnesses' testimony reveals that (1) each had a significant opportunity to view Gaines during the crimes, (2) that they paid a fair degree of attention during the robbery, (3) that they gave reasonably accurate descriptions of Gaines following the crimes, (4) that they were generally certain about their identifications of Gaines, and (5) the length of time between the robberies each witnessed and the line-up confrontation ranged from less than a week to slightly more than a year. Accordingly, under *Biggers*, the witnesses' identifications of Gaines were reliable and the court did not err in admitting this evidence.

## II. Gaines's Challenge to the Show-up Identification

Gaines also argues that the district court erred in admitting into evidence show-up and in-court identifications by twice-robbed teller, Alexis Stanton, because Stanton was taken to a "field" show-up at the arrest scene where Gaines was obvi-ously in custody. While any on-the-scene-of-arrest show-up identification is inherently suggestive, the Supreme Court has found such show-ups constitutional. *Biggers*, 409 U.S. at 198, 93 S.Ct. 375, 34 L.Ed.2d 401. We have recognized that show-up identifications are not objectionable unless the "procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *United States v. Kessler*, 692 F.2d 584, 585 (9th Cir.1982) (citation omitted). We have acknowledged that properly conducted show-up identifications are a "salutory" police practice permitting eyewitnesses to identify a perpetrator while the incident is fresh on their minds. *Id.*

■ In this case, we do not find that the show-up identification was impermissibly suggestive. While Stanton did observe Gaines getting out of the police car and flanked by officers, Gaines was wearing his street clothes and Stanton could not tell that he was handcuffed. The show-up was conducted less than three hours after the last robbery and comported with standards we have generally found acceptable.[2]

■ Even if the in-field show-up was unduly suggestive, the district court did not abuse its discretion in finding Stanton's identification sufficiently reliable to be admissible. Stanton had the opportunity to observe Gaines at close range during not one but two robberies, she paid close attention, and she provided a detailed statement shortly after the commission of

---

1. Those factors are (1) the witness' opportunity to observe the suspect at the time of the crime; (2) the witness' degree of attention at that time; (3) the accuracy of any prior description given by the witness; (4) the level of certainty at the confrontation; and (5) the length of time between the crime and the identification confrontation.

2. *See, e.g., Kessler*, 692 F.2d at 587 (holding that show-up was not impermissibly sugges-tive although suspect was handcuffed and surrounded by police officers, since those indicia of custody were "necessary for the prompt and orderly presentation of the suspect, consistent with protection of the officers and witnesses"); *Bagley*, 772 F.2d at 491–92 (finding one-man show-up at bank with defendant handcuffed and surrounded by law enforcement officers within an hour and a half of the robbery was suggestive, but not impermissibly so).

the crimes, including a very accurate description of Gaines. Only a few hours passed between the last robbery and the show-up. Stanton was told she was under no obligation to identify the suspect as the robber and she was unequivocal in her identification of Gaines. Under the totality of the circumstances and the *Biggers* factors, Stanton's identification of Gaines was independently reliable and its admission did not raise substantial likelihood of irreparable misidentification.

### III.  Gaines's *Miranda* Challenge

Gaines next contends that the district court erred in finding that Gaines effectively waived his *Miranda* rights and admitting Gaines's post-arrest statement to the arresting detective concerning the location of Gaines's gun. We review *de novo* whether Gaines voluntarily waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and for clear error whether the waiver was knowing and intelligent. *United States v. Cazares*, 121 F.3d 1241, 1243 (9th Cir. 1997). When evidence of a statement given in violation of *Miranda* is admitted into evidence, we will still affirm a conviction provided that the error was harmless. *See United States v. Butler*, 249 F.3d 1094, 1098 (9th Cir.2001).

We have recognized that courts must look to the totality of the circumstances to determine whether there was a valid waiver of *Miranda* rights. *United States v. Vallejo*, 237 F.3d 1008, 1014, *amended by* 246 F.3d 1150 (9th Cir.2001). We have

also recognized that "[t]o solicit a waiver of *Miranda* rights, a police officer need neither use a waiver form nor ask explicitly whether the defendant intends to waive his rights." *Cazares*, 121 F.3d at 1244. Where it is clear that the defendant acknowledged his understanding of his rights, his subsequent answers to questions constitutes a valid and implicit waiver. *Id.*

■ In this case, Gaines was read his *Miranda* rights immediately after arrest and clearly stated that he understood them. Gaines offers no evidence that his post-*Miranda* response to the arresting officer's inquiry about Gaines's gun was coerced, and offers no legal authority for his contention that a valid *Miranda* waiver requires "something more [than] simply a pause between an accused's acknowledgment that he understands his *Miranda* rights and a pointed question...." Considering the totality of the circumstances, we agree with the district court that Gaines voluntarily waived his rights and hold that his statement concerning the gun location was properly admitted.

■ Even if Gaines had not voluntarily waived his rights, his statement regarding the gun was admissible under the public-safety exception.[3] While Gaines was already handcuffed and lying on the ground when questioned about the gun, the application of the exception is not limited to circumstances in which the defendant, alone, may access the gun, but extends to scenarios in which others may find or use the gun thus threatening public safety.[4] It

---

3. The public-safety exception holds that *Miranda* warnings need not be given when "police officers ask questions reasonably prompted by a concern for the public safety." *New York v. Quarles*, 467 U.S. 649, 656, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984); *United States v. Reilly*, 224 F.3d 986, 992 (9th Cir.2000).

4. *See, e.g., Quarles*, 467 U.S. at 651–52, 104 S.Ct. 2626 (applying exception where officer

asked suspect, who fled into a supermarket after committing an armed rape and was arrested wearing an empty shoulder holster, where the gun was because an accomplice or members of public might make use of it or come upon it); *Allen v. Roe*, 305 F.3d 1046, 1050–51 (9th Cir.2002) (applying exception where suspect in shooting was arrested a mile-and-a-half from the crime scene, without the gun, because it was "reasonably possible

was conceivable to the arresting officer that Gaines's gun could be accessed and used by Gaines's daughter, who was in the car at the time of his arrest, or by others to the threat of the public. The officer's question—"Where's the gun?"—was not investigatory in nature and was not asked in an attempt to link Gaines to the bank robberies, but rather was directed solely at determining the whereabouts of the gun, thus falling clearly within the exception. *Reilly*, 224 F.3d at 992–93.

■ Even if there had been error to admit Gaines's statement concerning the gun, it would be harmless. As Gaines was licensed to carry a gun (and routinely did so) as a bail enforcement officer, it is not clear that his statement that the gun was in his car was inculpatory as to his guilt in the robberies. And, while the arresting officers found money and stolen checks in Gaines's car along with the gun, the officers eventually searched Gaines's vehicle pursuant to a warrant that they would have sought and obtained regardless of whether Gaines made the gun-related statement or not. Finally, given the overwhelming evidence against Gaines beyond the possession of the gun, it is not likely that the admission of the statement had any effect on the verdict.

### IV. Gaines's Challenge to Prosecutorial Conduct

■ Gaines next contends that he is entitled to a new trial because the prosecutor referred to him as a liar or to his testimony as lies three times during rebuttal argument. Because Gaines failed to make a contemporaneous objection, we review his claim of prosecutorial misconduct for plain error, *United States v. Geston*, 299 F.3d 1130, 1134–35 (9th Cir.2002), which even if shown is harmless unless it "seriously affected the fairness, integrity, or public reputation of judicial proceed-

ings, or where failing to reverse a conviction would result in a miscarriage of justice." *United States v. Lam*, 251 F.3d 852, 861 (9th Cir.2001). In evaluating claims of alleged misconduct for plain error, we consider the context in which the statements were made, including the strength of the evidence suggesting guilt, *United States v. Laurins*, 857 F.2d 529, 539 (9th Cir.1988), the isolated nature of the comments, *Sassounian v. Roe*, 230 F.3d 1097, 1106–07 (9th Cir.2000), and the neutralizing effect of jury instructions. *United States v. Bracy*, 67 F.3d 1421, 1431 (9th Cir.1995).

We have recognized that it "is neither unusual nor improper for the prosecutor to voice doubt about the veracity of a defendant who has taken the stand," *United States v. Birges*, 723 F.2d 666, 672 (9th Cir.1984), and that, in "instances of flatly contradictory testimony on important issues ... it [is] proper for the government to argue that the jury ought not to believe the [defendant's] version." *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991). In *Molina*, in which an informant's testimony conflicted directly with the defendant's testimony on "important" issues, we approved as reasonable a prosecutorial closing far stronger than the one at issue here because "the inference [was] unavoidable that 'somebody is lying.'" *Id.*

■ In this case, Gaines's defense was grounded solely on his own testimony and the unlikely alibis he offered for two of the robberies. The government called four credible rebuttal witnesses who directly contradicted Gaines's alibis. As in *Molina*, the "inference [was] unavoidable" that either Gaines or the government's witnesses were lying and "it was proper for the government to argue that the jury ought not to believe the [defendant's] version." *Id.* The government's three isolated

that anyone could have found the gun and used it").

uses of the word "liar" or "lied" were tied to a recap of the contradictory evidence and the inferences to be drawn therefrom.

■ Additionally, we have recognized that where the evidence is so strong that the prosecutor's remarks had no effect on the jury, no contemporaneous objection was made, and the prosecutor's statements are tempered by the court's instructions to the jury, reversal is not required. *See Laurins*, 857 F.2d at 539; *Bracy*, 67 F.3d at 1431. In this case, the evidence against Gaines was overwhelming and the court clearly instructed the jury that it was not to consider the arguments of the attorneys as evidence. Accordingly, since the prosecution's statements did not likely affect the fairness of Gaines's trial nor result in a miscarriage of justice, the district court did not err in refusing to grant Gaines a new trial.

## V. Gaines's Eighth Amendment Challenge

Finally, Gaines argues that the 182–year sentence resulting from the imposition of consecutive sentences on the eight firearms counts is "grossly disproportionate," constituting cruel and unusual punishment in violation of the Eighth Amendment. Gaines further argues that, given that the Government would have been satisfied with a 25–year sentence as reflected by its best plea offer, the sentence imposed based on his conviction by the jury improperly punishes him for exercising his right to proceed to trial rather than plead. We review *de novo* the legality of a district court's sentence under the Eighth Amendment. *United States v. Harris*, 154 F.3d 1082, 1083–84 (9th Cir.1998).

■ The federal statute prohibiting use of a firearm when committing a crime of violence requires a mandatory minimum sentence of seven years' imprisonment for conviction on the first count where, as here, the firearm was brandished. 18 U.S.C. § 924(c)(1)(A)(ii). A mandatory minimum sentence of twenty-five years' imprisonment is required for each subsequent conviction of firearm use during commission of a violent crime. 18 U.S.C. § 924(c)(1)(C)(i). Section 924(c)(1)(D)(ii) requires that these terms of imprisonment be served consecutively.

■ With respect to Gaines's argument that he is being punished for exercising his constitutional right to trial (a due process rather than Eighth Amendment claim), courts have generally found a due process violation in the imposition of a harsher sentence than that offered as part of a rejected plea bargain only where indicia of vindictiveness on the part of the judge are present. *See generally*, Kurtis A. Kemper, *Propriety of Sentencing Judge's Imposition of Harsher Sentence than Offered in Connection with Plea Bargain Rejected or Withdrawn Plea by Defendant*, 11 A.L.R. 6th 237 (2006) (summarizing and compiling cases). In this case, while Judge Zilly was apparently made aware of the specifics of the Government's offer in advance of trial, there is no indication that he participated in the plea negotiations nor that he imposed sentence for the firearms convictions in retaliation for Gaines not entering a plea and instead exercising his right to trial. Judge Zilly had, in fact, expressed concern at the length of the potential sentence, given the mandatory firearms sentences, in discussing the Government's need to proceed on all counts during a pretrial scheduling conference. It is clear that judicial vindictiveness played no role in Gaines's sentencing.

We have directly rejected Gaines's argument that the lengthy terms of imprisonment that may result from the mandatory consecutive sentences imposed by § 924(c) run afoul of the Eighth Amendment, despite the removal of sentencing discretion from the courts. *See United States v. Parker*, 241 F.3d 1114, 1117–18 (9th Cir.

2001); *United States v. Harris,* 154 F.3d 1082, 1084–85 (9th Cir.1998); *United States v. Wilkins,* 911 F.2d 337, 339 (9th Cir.1990); *see also United States v. Fontanilla,* 849 F.2d 1257, 1258–59 (9th Cir. 1988) (confirming Congressional intent that sentences for multiple firearms convictions under § 924 be served consecutively). Gaines seeks to distinguish *Harris* and *Parker* on the grounds that his sentence is over twice the length of the sentences upheld in those cases (95 years and 300 months, respectively). However, we have recognized the substantial deference accorded the legislative branch to assess appropriate penalties for crimes and to its legitimate interest in treating repeat offenses more severely than first offenses. *See Harris,* 154 F.3d at 1084 (citations omitted). For these reasons, and because the sentences routinely upheld under § 924 by this and other courts have, like the sentence here, amounted to life sentences for the defendants regardless of their relative lengths, this argument is unavailing.

While we have consistently upheld § 924's consecutive sentencing scheme as constitutional, Gaines correctly notes that we have expressed regret that district courts are not permitted discretion to depart downward from the harsh, often life-equivalent, sentences that Congress has deemed appropriate for repeat firearms offenders. *See id.* at 1085. Although we have implored the legislature to reconsider such mandatory minimum sentences, it has not done so and we are bound by precedent on this issue.

AFFIRMED.

* This disposition is not appropriate for publication and may not be cited to or by the courts