Filed 5/31/16  P. v. Wilson CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DEONTAY LAQUAWN WILSON,<br><br>        Defendant and Appellant. | A144395<br><br>(Alameda County<br>Super. Ct. No. 172500) |
| In re DEONTAY LAQUAWN WILSON,<br><br>        on Habeas Corpus. | A147775 |

A jury convicted defendant Deontay Laquawn Wilson of second degree robbery with personal use of a firearm. (Pen. Code, §§ 211, 12022.53, subd. (b).)[1] Defendant admitted two prior convictions, one for robbery and the other for possession of a firearm by a felon. The court sentenced defendant to 25 years in prison.[2]

Defendant contends that the prosecution's case against him "rested on an impermissibly suggestive and unreliable identification" by the victim. He raises three issues on appeal, each relating to the identification: (1) defense counsel was ineffective in failing to move to suppress the identification; (2) the court erred in giving a standard jury

---

[1] All further section references are to the Penal Code.

[2] The court imposed a 10-year term for robbery (the upper term of five years doubled for the strike prior). (§§ 213, subd. (a)(2), 667, subd. (a)(1).) Added to this are consecutive terms of 10 years for the firearm enhancement (§ 12022.53, subd. (b)) and five years for a prior serious felony conviction (§ 667, subd. (a)(1)).

1

instruction on factors relevant to an evaluation of eyewitness identification; and (3) defense counsel was ineffective in failing to object to the instruction on eyewitness identification. Defendant has also filed a petition for a writ of habeas corpus, which we have consolidated with the appeal. In his petition, defendant claims ineffective assistance of counsel for failing to move to suppress the victim's identification, as asserted on appeal, and also for failing to present a second eyewitness to the robbery and an expert witness on the fallibility of eyewitness testimony.

We shall affirm the judgment and deny the habeas corpus petition.

### Summary of Evidence Presented at Trial

There was evidence at trial of the following facts. Ron Jaillet buys cell phones from individuals and resells them at a profit to earn extra income. On the afternoon of June 18, 2013, Jaillet received a telephone call in response to his Internet advertisement offering to buy iPhones. The male caller offered to sell two iPhones sealed in their original packaging for $900. Jaillet agreed to meet the man near the Hayward BART station and proceeded to drive there with his daughter in the car. As Jaillet neared the station, the caller telephoned and asked to meet near the Oakland Coliseum. As incentive for the longer drive, the caller offered to sell the phones for $750. Jaillet agreed to the new location and price. As Jaillet neared the Oakland Coliseum, the caller telephoned again and asked to meet at an address near the corner of San Pablo Avenue and 28th Street in Oakland. Jaillet agreed. Jaillet arrived at the designated address around 6:30 p.m. and saw two young African-American men standing on the sidewalk. Jaillet drove up to the men, rolled down his window, and asked are "you the guys that are selling the phones." They said yes and approached the rear doors to enter the car. Jaillet was "surprised" because he had not invited the men into his car. He locked his car doors before they could enter and told them he would meet them across the street.

Jaillet parked his car and approached the men on the sidewalk. One of the men was holding a bag. Jaillet was looking at the bag, assuming it contained the phones he was there to buy, when the other man stepped toward Jaillet and pressed the muzzle of a gun against his chest. The gun was a small black pistol that felt like it was made of "solid,

2

heavy" metal. The gunman, later identified as defendant, told Jaillet, in an "intense" "angry" tone of voice, "don't move." Jaillet did his best to stand still but he was frightened and "shaking like a leaf." Defendant continued to press the gun against Jaillet's chest while reaching into Jaillet's pockets with his free hand. Defendant removed $250 from Jaillet's shirt breast pocket and $500 from his pants pocket. Defendant also took Jaillet's cell phone, car keys, and wallet. The wallet contained cash, a driver's license, debit cards and work identification. Throughout this period of 15 to 30 seconds, defendant kept the gun pressed against Jaillet's chest and repeatedly said "don't move." Jaillet "was looking at his face mostly" during the encounter, with a few glances to the gun. Their faces were about two feet apart and it was "complete daylight." Jaillet is nearsighted. He testified that, without glasses, he can see clearly for 10 feet and his vision "starts getting blurry" at longer distances. He was not wearing glasses during the robbery and, when asked at trial if he requires glasses when looking at someone two feet away, replied "Absolutely not." After emptying Jaillet's pockets, the two men ran down 28th Street. Jaillet flagged down motorists and asked them to telephone the police. The police arrived within a few minutes.

Oakland Police Officer Rodney Kirkland testified that he responded to Jaillet's report of a robbery around 6:30 p.m. Jaillet described the gunman as "male black, [age] 20 to 22, about five eleven, 170 [pounds], medium complexion, short black hair, goatee, all dark clothing." He described the second man as "male black, early 20s, five eight, 210 [pounds], medium complexion, black hair, white T-shirt, unknown color pants." At 6:38 p.m., Officer Kirkland broadcast Jaillet's description of the robbers.

At 6:41 p.m., Officer Roberto Ruiz and another officer were in a marked patrol car when they observed a car without license plates driving near Martin Luther King Boulevard and 42nd Street. The location is less than two miles from the scene of the robbery. The officers initiated a traffic stop for a vehicle code violation. Defendant was driving the car and a second man was a passenger. Officer Ruiz detained the men, believing they "fit the general description" of the robbers. A search of defendant's pockets found $500 in cash and debit cards and a work identification card in Jaillet's

3

name. The car was searched but no other items taken from Jaillet were recovered, nor was a gun found.

Officer Kirkland drove Jaillet to view the detained men.  Kirkland testified that police practice when performing a "field show-up" is to avoid influencing the witness or "force an idea that they're being pressured like this is the guy who committed the crime." The officer testified that he followed this practice with Jaillet and was "clear that this person may or may not be the person who committed the crime." Jaillet testified that Kirkland did not pressure him to make an identification, telling him "if you recognize somebody, let us know. If you don't recognize him, let us know that as well." Jaillet did recall the officer saying, enroute to the in-field identification, that the police "had found [his] identification in a vehicle and that [he was] to drive over there to see if [he] can identify the individuals." The officer did not, however, tell him "specifically that the people he was going to show [him] were the ones that had taken [his] identification."

Kirkland and Jaillet arrived at the detention site around 7:00 p.m. Jaillet sat in a patrol car across a four-lane street from where defendant and the other man were detained in separate patrol cars and individually removed from the cars to be viewed by Jaillet. The distance between Jaillet and the suspects was about 41 feet, according to Officer Kirkland, or 26 feet according to Jaillet. Jaillet identified defendant as the gunman in the robbery but did not recognize the other detained man.

Jaillet was not wearing glasses when he made the in-field identification of defendant. Jaillet testified that his vision was not "crystal clear" at the time but it was clear enough for him to positively identify defendant. Jaillet said he recognized defendant "right away," viewing his face, build and hair. Jaillet testified he "was a hundred percent positive that night that [his] identification was accurate." Jaillet was wearing his glasses at trial when he identified defendant as the gunman in court. Jaillet testified: "I'm positive he's the guy that held the gun to my chest. I'm hundred percent positive. I'm looking at him now. I recognize him. I have no doubts."

On cross-examination, defense counsel had Jaillet remove his glasses and look at a series of photographs on a television screen about 28 feet, six inches from the witness

4

stand. One of the photos was of defendant but Jaillet failed to recognize him. On redirect, Jaillet testified that he saw enough features in the distant photograph to think that the individual depicted was "probably" defendant and made a positive identification when the photograph was brought within two feet of him.

No witnesses for the defense were presented. In closing argument to the jury, defense counsel argued that Jaillet could not have made an accurate in-field identification from 40 feet away given his impaired vision and that his in-court identification was based on defendant's presence in court, not an independent recollection of the robbery. Counsel asserted: "Ron Jaillet is not a good witness. He's not a credible man."

**Discussion**

Defendant contends his conviction rests on "an impermissibly suggestive and unreliable identification" by the victim and raises claims of ineffective assistance of counsel and an erroneous jury instruction related to that identification. In a petition for a writ of habeas corpus, defendant also claims ineffective assistance of counsel for failing to present a second eyewitness to the robbery and an expert witness on the fallibility of eyewitness testimony. We treat these claims in the order raised by defendant in his brief and petition.

1. *Defendant has not demonstrated that his counsel was ineffective for not seeking to suppress the identification from the field show-up.*

Defendant claims the victim's identification of defendant as the robbery gunman resulted from an "unconstitutionally suggestive procedure" tying defendant to the crime because the police told the victim they "found [his] identification in a vehicle and that [he was] to drive over there to see if [he] can identify the individuals." Defendant argues that the police statement suggested the detained individuals were the robbers and that counsel was deficient in failing to file a pretrial motion to suppress the "tainted" identification.

" '[T]he right to counsel is the right to the effective assistance of counsel.' " (*Strickland v. Washington* (1984) 466 U.S. 668, 686.) "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having

5

produced a just result." (*Ibid.*) To establish ineffective assistance, defendant must show both that his counsel's performance was deficient and that he suffered prejudice. (*Id.* at p. 687; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) Counsel's failure to challenge an eyewitness identification is not deficient if the identification procedure comports with due process. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 725.) "Counsel is under no obligation to make idle or frivolous motions." (*Id.* at p. 726.)

"Due process requires the exclusion of identification testimony only if the identification procedures used were unnecessarily suggestive and, if so, the resulting identification was also unreliable." (*People v. Yeoman* (2003) 31 Cal.4th 93, 123.) "While any on-the-scene-of-arrest show-up identification is inherently suggestive, the [United States] Supreme Court has found such show-ups constitutional." (*U.S. v. Gaines* (9th Cir. 2006) 200 Fed.Appx. 707, 711, citing *Neal v. Biggers* (1972) 409 U.S. 188, 198.) California courts have long upheld the constitutionality of field identifications of a single suspect. (See, e.g., *People v. Craig* (1978) 86 Cal.App.3d 905, 913; *People v. Anthony* (1970) 7 Cal.App.3d 751, 764-765.) In *People v. Gomez* (1976) 63 Cal.App.3d 328, 335-337, the court held that a one person show up was permissible notwithstanding the fact that the victim was told there was a suspect the police wanted her to look at and defendant was standing outside a patrol car handcuffed with two officers flanking him. Despite their suggestiveness, "the law favors field identification procedures when in close proximity in time and place to the scene of the crime." (*In re Richard W.* (1979) 91 Cal.App.3d 960, 970.) "[P]roperly conducted show-up identifications are a 'salutary' police practice permitting eyewitnesses to identify a perpetrator while the incident is fresh on their minds." (*U.S. v. Gaines, supra,* at p. 711.) The suggestiveness of an in-field identification is " 'offset by the likelihood that a prompt identification within a short time after the commission of the crime will be more accurate than a belated identification days or weeks later.' " (*In re Richard W., supra,* at p. 970.) " '[T]he immediate knowledge whether or not the correct person has been apprehended is of overriding importance and service to law enforcement, the public and the criminal suspect himself.' " (*Ibid.*)

Defendant has not shown that the identification procedure used in this case was unnecessarily suggestive. Officer Kirkland, who drove Jaillet to view the detained men, testified that he strove to avoid influencing the witness and was "clear that this person may or may not be the person who committed the crime." Jaillet testified that Officer Kirkland never put pressure on him to make an identification, telling him "if you recognize somebody, let us know. If you don't recognize him, let us know that as well." Jaillet did recall the officer saying, enroute to the in-field identification, that the police "had found [his] identification in a vehicle and that [he was] to drive over there to see if [he] can identify the individuals." It would have been better practice for the officer not to have mentioned recovering the stolen identification. Nevertheless, the in-field identification procedure used here was not *unduly* suggestive. Jaillet was admonished that the detained men may not be the robbers and cautioned against making an identification unless he recognized them. Jaillet identified only one of the two detained men as a robber, which indicates that he independently evaluated the men free from any suggestiveness in the procedure employed. (See *In re Carlos W.* (1990) 220 Cal.App.3d 372, 386-387 [fact that victim positively identified one suspect but made no identification of suspect's companion demonstrates in-field show-up not unduly suggestive].)

Even if the in-field show-up was suggestive to some degree, the identification was sufficiently reliable to be admissible. "[R]eliability is the linchpin in determining the admissibility of identification testimony." (*Manson v. Brathwaite* (1977) 432 U.S. 98, 114.) Reliability is assessed under the totality of the circumstances. (*Neil v. Biggers, supra,* 409 U.S. at p. 199.) "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." (*Id.* at pp. 199-200.) "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." (*Manson, supra,* at p. 114.)

Jaillet had the opportunity to observe the gunman at close range. Their faces were about two feet apart and Jaillet "mostly" was looking at the robber's face during a daylight encounter that lasted between 15 and 30 seconds. Jaillet provided a detailed description of the gunman that was generally consistent with defendant's appearance. Defendant is three inches shorter and lighter in weight than Jaillet described the gunman but there are no major discrepancies. Jaillet provided the description within a few minutes of the robbery and less than 35 minutes passed between the robbery and Jaillet's identification of defendant as the gunman. Although Jaillet is near-sighted, was not wearing glasses when he made the in-field identification, and his vision admittedly was not "crystal clear," he recognized defendant "right away," viewing his face, build and hair and testified he "was a hundred percent positive that night that [his] identification was accurate." These indicators of Jaillet's ability to make an accurate identification are far stronger than any suggestive effect of the identification procedure. Jaillet testified that Officer Kirkland never put pressure on him to make an identification, telling him "if you recognize somebody, let us know. If you don't recognize him, let us know that as well." Under the totality of the circumstances, Jaillet's identification was reliable and its admission did not raise a substantial likelihood of irreparable misidentification as to warrant its suppression. Absent " 'a very substantial likelihood of irreparable misidentification' . . . such evidence is for the jury to weigh." (*Manson v. Brathwaite, supra,* 432 U.S at p. 116.) "We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (*Ibid.*) Counsel was not deficient in failing to move to suppress the field identification.

Moreover, any deficiency in this regard was not prejudicial under the facts of this case. "Even if a defendant shows that particular errors of counsel were unreasonable . . . the defendant must show that they actually had an adverse effect on the defense. [¶] It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." (*Strickland v. Washington, supra,* 466 U.S. at p. 693.) "The

defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.)

There is no reasonable probability that the result of the proceeding would have been different had the in-field identification been suppressed. Within 15 minutes of the robbery, defendant was found less than two miles away driving a car without license plates with $500 in cash and the victim's stolen photo identification and debit cards in his pants pocket. Coupled with this physical evidence is Jaillet's courtroom identification. Jaillet, who was wearing his glasses when testifying at trial, made an unequivocal identification of defendant as the gunman. Defendant asserts that Jaillet's courtroom identification is itself inadmissible as the product of the in-field show-up. We disagree. "[T]he taint of an unlawful confrontation or lineup may be dispelled if the People show by clear and convincing evidence that the identification of the defendant had an independent origin." (*People v. Ratliff* (1986) 41 Cal.3d 675, 689.) The record here supports a finding that Jaillet's courtroom identification was based on his recollection of the robbery. Jaillet testified at trial: "I'm positive he's the guy that held the gun to my chest. I'm hundred percent positive. I'm looking at him now. I recognize him. I have no doubts."

2. *A standard jury instruction on factors relevant to an evaluation of eyewitness identification does not violate due process.*

At defense counsel's request, the court instructed the jury with CALCRIM No. 315, which directed the jury to consider numerous questions when evaluating eyewitness identification testimony, including "How certain was the witness when he or

she made an identification?."[3] Defendant argues that CALCRIM No. 315 is "outdated, unfair," and violates due process by including witness certainty among the factors used to evaluate the accuracy of identification testimony despite social studies showing an eyewitness's certainty in his or her identification is not a reliable indicator of accuracy. Defendant maintains that, "[i]n light of the new scientific evidence" concerning the fallibility of eyewitness identifications, either the trial court erred in giving the instruction or trial counsel was ineffective in requesting the instruction without modification.

Because defendant claims his right to due process was violated by use of the instruction, we consider the contention on appeal even though defense counsel did not object to the instruction and, in fact, requested it. (§ 1259; *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7.) There was no due process violation. It is true, as defendant argues, that eyewitness identifications are fallible but fallibility is not a new discovery. Almost 50 years ago, the United States Supreme Court observed that "[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with

---

[3] CALCRIM No. 315 states in full: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: Did the witness know or have contact with the defendant before the event? [¶] • How well could the witness see the perpetrator? [¶] • What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation? [¶] • How closely was the witness paying attention? [¶] • Was the witness under stress when he or she made the observation? [¶] • Did the witness give a description and how does that description compare to the defendant? [¶] • How much time passed between the event and the time when the witness . . . identified the defendant? [¶] • Was the witness asked to pick the perpetrator out of a group? [¶] • Did the witness ever fail to identify the defendant? [¶] • Did the witness ever change his or her mind about the identification? [¶] • How certain was the witness when he or she made an identification? [¶] • Are the witness and the defendant of different races? [¶] • Was the witness able to identify other participants in the crime? [¶] • Was the witness able to identify the defendant in a photographic or physical lineup? [¶] • Were there any other circumstances affecting the witness's ability to make an accurate identification? [¶] The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."

instances of mistaken identification." (*United States v. Wade* (1967) 388 U.S. 218, 228.) The law has been responsive to this reality in evolving various protective measures to lessen the risk of mistaken identification. To this end, "vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt" exist to assist juries in assessing eyewitness testimony. (*Perry v. New Hampshire* (2012) 132 S.Ct. 716, 721.)

Among these efforts to safeguard against mistaken identification, the California Supreme Court approved use of a jury instruction listing factors relevant to the evaluation of eyewitness identification. (*People v. Wright* (1988) 45 Cal.3d 1126, 1138-1144.) The court held that "CALJIC No. 2.92 [CALCRIM No. 315's predecessor] or a comparable instruction should be given when requested in a case in which identification is a crucial issue and there is no substantial corroborative evidence." (*Wright,* p. 1144.) "[A] proper instruction on eyewitness identification factors should focus the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence." (*Id.* at p. 1141.)

Among the list of relevant factors, CALJIC No. 2.92 included "[t]he extent to which the witness is either certain or uncertain of the identification." (*People v. Wright, supra,* 45 Cal.3d at p. 1154.) The California Supreme Court later reaffirmed the propriety of including a certainty factor in a jury instruction on the evaluation of identification testimony (*People v. Johnson* (1992) 3 Cal.4th 1183, 1231-1232) and more recently rejected the assertion that a trial court has a sua sponte duty to delete the certainty factor (*People v. Ward* (2005) 36 Cal.4th 186, 213). The high court is well aware of studies showing a "lack of correlation between the degree of confidence an eyewitness expresses in his identification and the accuracy of that identification," and was cognizant of these studies when it first adopted a jury instruction listing witness certainty among the factors to be considered by a jury considering eyewitness identification. (*People v. McDonald* (1984) 37 Cal.3d 351, 369, overruled on other grounds *People v. Mendoza* (2000) 23

Cal.4th 896, 914.) Nevertheless, the court approved listing "[t]he extent to which the witness is either certain or uncertain of the identification" as a factor for the jury's consideration in evaluating an eyewitness identification. (*People v. Wright, supra,* at pp. 1141, 1154.) The court did so against the argument of a dissenting justice who maintained that the instruction would reinforce the mistaken "lay belief that the more certain an eyewitness is of his identification, the more likely the identification is correct." (*Id.* at p. 1159 (dis. opn. of Mosk, J.).) The majority concluded that listing relevant factors in a "neutral manner," without endorsing "a particular psychological theory relating to the reliability of eyewitness identifications" was the proper approach. (*Id.* at p. 1141.) "The instruction should *not* take a position as to the *impact* of each of the psychological factors listed. . . . An instruction that 'explained' the influence of the various psychological factors would of necessity adopt the views of certain experts and incorporate the results of certain psychological studies while discounting others. It would require the trial judge to endorse, and require the jury to follow, a particular psychological theory relating to the reliability of eyewitness identifications. Such an instruction would improperly invade the domain of the jury, and confuse the roles of expert witnesses and the judge." (*Ibid.*) A neutral listing of factors, the court believed, would respect the jury's role in assessing witness credibility while still permitting counsel to argue that a particular witness's identification was unreliable.

Whether or not the instruction would be improved by further clarifying the relevance of witness certainty, there is no basis for declaring the instruction unconstitutional as currently written. We are bound by California Supreme Court authority approving the instruction with its certainty factor. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) We also note that the United States Supreme Court continues to consider "the level of certainty demonstrated at the confrontation" between the eyewitness and suspect as a relevant factor in evaluating a witness's ability to make an accurate identification. (*Perry v. New Hampshire, supra,* 132 S.Ct. at pp. 724-725 & fn. 5.) Federal courts have recognized that there is "no United States Supreme Court case holding that due process is violated when, in assessing the reliability of a

12

witness's identification of a defendant, the jury considers the witness's level of certainty in making the identification. On the contrary, the existing Supreme Court precedent appears to approve of such considerations." (*Arroyo v. Biter* (C.D. Cal. June 22, 2012, No. ED CV 12-00088-GAF (RZ)) 2012 U.S.Dist. Lexis 180579, pp. **13-14.) The trial court did not err in giving CALCRIM No. 315 with its certainty factor. Likewise, defense counsel was not ineffective in failing to request modification of the instruction to omit the certainty factor.

3. *Defendant has not demonstrated that his counsel was ineffective for not presenting Michelle Jaillet as a witness.*

Defendant contends that trial counsel was ineffective for failing to interview or call as a witness Jaillet's daughter, Michelle, who saw the robbery. Jaillet testified that he drove to the Oakland meeting place with his daughter in the car and had her wait in the parked car while he walked across the street and approached the men on the sidewalk to discuss the cell phone purchase. The robbery occurred about 30 feet from the parked car in which Michelle was sitting. Michelle is, in her father's words, "mentally challenged." He explained that she does "basic work" at Hope Services "like put things in boxes and things like that." Hope Services is an organization that provides services to people with developmental disabilities.

Michelle did not testify at trial but she did speak to the police. A police officer wrote down her statements and defendant submits these statements as exhibits to his habeas corpus petition. Michelle's birth date is excised from the statements and no other information as to Michelle's age is revealed in the record. In the statement she made shortly after the robbery, Michelle said "I saw the guys talking to my dad then I saw my dad waving his hands around. And the guys ran away towards 27th Street. I asked my dad what happened and he said he got robbed." Michelle described one of the men as "a Black male, 20-25 yrs., 5'7", heavy set wearing a white shirt" and the other as "a Black male, 20 yrs., 5'9", thin wearing a brown shirt." Michelle said "I can recognize the two guys if I see them again." Michelle was taken to see defendant and his companion when they were detained by the police. Michelle gave a second statement saying that she did

13

not recognize either of the two men as a robber. She said the detained men were wearing black T-shirts while she "remember[ed] that one of the guys [who committed the robbery] was wearing a white T-shirt."

Defendant claims trial counsel was incompetent in failing to interview or to call Michelle as a witness. He has not presented a sworn declaration from trial counsel explaining the decision not to present Michelle as a witness, only a statement from appellate counsel relating parts of a conversation with trial counsel. Appellate counsel declares that trial counsel, who had the police statements in his file, said "he made a strategic decision that calling [Michelle] would not help" defendant because counsel was told Michelle "was developmentally delayed, like a child," and Michelle "had said that [defendant] was wearing the same T-shirt as one of the robbers."

Defendant has failed to show that counsel's strategic decision not to call Michelle as a witness was unreasonable. Defendant argues that Michelle's developmental disability did not necessarily disqualify her as a witness, which is true. But trial counsel could reasonably believe that a jury would react unfavorably to subjecting a developmentally disabled person to the rigors of questioning for the purpose of disputing her father's testimony. The usefulness of her testimony is also questionable. The prosecution would no doubt argue that Michelle did not identify defendant as one of the robbers but her father did because she was 30 feet from the gunman and her father was only two feet from him, virtually face-to-face. Moreover, her description of the robbers was consistent with her father's description, apart from a slight difference in the estimated height of the robbers and her height estimate is closer to defendant's actual height. Michelle also said, according to trial counsel, that defendant "was wearing the same T-shirt as one of the robbers." Defendant argues that trial counsel was mistaken about a matching T-shirt because Michelle's police statements said one robber wore a brown shirt and the other wore a white shirt, and the detained suspects both wore black shirts. But trial counsel may have been referring to information from another source. The record offered here does not exclude that possibility. In any event, trial counsel could

14

reasonably conclude that there was little to gain, and much to lose, by calling Michelle as a witness.

Defendant has not demonstrated that his counsel was ineffective for not calling Michelle as a witness. "Because a petition for a writ of habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the petitioner bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them." (*People v. Duvall* (1995) 9 Cal.4th 464, 474.) "An appellate court receiving such a petition evaluates it by asking whether, assuming the petition's factual allegations are true, the petitioner would be entitled to relief." (*Id.* at pp. 474-475.) The petition fails to state a prima facie case for relief.

4. *Defendant has not demonstrated that his counsel was ineffective for not presenting an expert witness on the fallibility of eyewitness testimony.*

Defendant claims his trial counsel was prejudicially deficient because counsel did not present expert testimony on eyewitness identification. The record before us does not disclose what actions, if any, trial counsel undertook to consult expert witnesses, nor has defendant shown that an expert witness would have provided favorable testimony particular to this case. Defendant's argument is, effectively, that a competent attorney must present an expert witness on the fallibility of eyewitness identification in every case involving an identification. The argument is untenable. In an appropriate case, an attorney *may* present expert testimony to assist the jury in understanding the scientific and psychological evidence as to factors believed relevant to an evaluation of eyewitness identifications. (*People v. McDonald, supra,* 37 Cal.3d at p. 377.) But there is "no support for the claim that expert testimony must be presented by a defense attorney in *every case*" where the prosecution relies on an eyewitness identification. (*People v. Datt* (2010) 185 Cal.App.4th 942, 952.) "The decision whether to call certain witnesses is a 'matter[] of trial tactics and strategy which a reviewing court generally may not second-guess.' " (*People v. Carrasco* (2014) 59 Cal.4th 924, 989.) Defendant has failed to make a prima facie showing of deficient performance by counsel.

15

There is also no showing of prejudice. As noted earlier, defendant's conviction does not rest on Jaillet's identification alone. Within 15 minutes of the robbery, defendant was found less than two miles away with the victim's stolen photo identification and debit cards in his pants pocket. There is no reasonable probability that the result of the proceeding would have been different had an expert testified about factors impacting the accuracy of eyewitness identifications. (*Strickland v. Washington, supra,* 466 U.S. at p. 694.)

### Disposition

The judgment is affirmed and the petition for writ of habeas corpus is summarily denied.

_____

Pollak, J.

We concur:

_____

McGuiness, P. J.

_____

Siggins, J.